**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| STRATEGIC PRODUCTS GROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LIFESCAN, INC. and LIFESCAN SCOTLAND, LTD., <br><br> Defendants. | Civil Action No. _____ <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Strategic Products Group, Inc., (hereinafter referred to as "SPG")

files this Complaint against Defendants, LifeScan, Inc. and LifeScan Scotland, Ltd.

(hereinafter referred to as "LifeScan" or "Defendants") to secure damages and

injunctive relief, and demanding trial by jury, claims and alleges as follows:

### I.  SUMMARY OF THE CASE

1.     This case concerns blood glucose monitoring systems, which

individuals with diabetes use to assist in maintaining healthy blood glucose levels.

Such systems typically consist of an electrochemical meter and disposable single-

use test strips.  LifeScan, a Johnson & Johnson ("J&J") subsidiary, dominates sales

in the United States of blood glucose self-monitoring systems.

2.     Diabetes is a chronic disease in which a person has a high level of

blood sugar (*i.e.*, glucose) because either the body does not produce enough

insulin, or cells do not respond properly to the insulin that the body does produce.

1

Diabetes may be managed through a variety of methods, including healthy eating, physical activity, and/or insulin injections.  If people with diabetes do not properly manage their glucose levels, medical complications (*e.g.*, hypoglycemia, cardiovascular disease, organ failure, or renal disease) may occur.

3.     Diabetes disproportionately affects older adults.  Approximately 27 percent of individuals ages 65 and older in the U.S. report having diabetes, whereas the reported percentage in the overall population is approximately 10 percent.

4.     A person with diabetes may use a hand-held meter to test the concentration of glucose in his or her blood.  To do so, the individual inserts a disposable test strip into the digital display meter.  A diabetes test strip is a small, thin, one-time-use piece of plastic on which a sample of blood is placed after pricking the skin with a lancet.  The meter's numerical reading of an individual's glucose level provides the information required for that person to manage his or her diabetes.  People with diabetes may need to perform glucose tests several, or more, times a day to assist them in maintaining appropriate glucose levels.

5.     In 2010, it was estimated that the U.S. was the largest market for blood glucose monitoring systems, when it was valued at $3.97 billion.  The blood glucose "test strip" market was the largest segment, with revenues of about $3.46 billion, and comprising about 87% of the total revenues.  The market for the actual blood glucose meters was estimated at $390 million and comprised about 10% of the entire market while lancets device (used to draw blood samples) were estimated to be worth $124 million.  The International Diabetes Federation ("IDF") estimated that in 2011 about 23.7 million adults in the U.S., representing 10.9% of the population, suffered from diabetes, the highest rate in the world. Consequently, the popularity and demand for blood glucose monitoring systems in the U.S. is high.

6.      According to GlobalData, the global glucose monitoring business will reach $12.2 billion in 2017, with $10.9 billion attributable solely to the test strip market segment.  As a point of reference, in 2010, the test strips themselves accounted for close to 90% of the total market value.  With the increase in the prevalence of diabetes, it is predicted that diabetes care and treatment will become a priority and more diabetic patients will opt to use blood glucose monitoring devices.

7.      The domestic industry for blood glucose monitoring systems is highly concentrated.  Including LifeScan, a mere four players share 83% of the total U.S. sales.  LifeScan claims to be the "the leading manufacturer and seller of blood glucose monitoring systems" (which LifeScan defines as meters and test strips) and boasts that it has "*more than* a 30% share of the total U.S. market."[1]

8.      LifeScan touts on its website that its "OneTouch systems [are] the #1 most prescribed brand by Endocrinologists and Primary Care physicians." Additionally, that "[e]very day more than 5 million people in the U.S. depend on LifeScan's OneTouch® Brand systems for simple testing and accurate results."

9.      The popularity of LifeScan's OneTouch "Ultra" brand of glucose monitoring devices has enabled LifeScan to compete aggressively and capture a dominant position.  LifeScan's OneTouch Ultra blood glucose monitoring system consists of meters and the disposable test strips for use with those meters.  Until UniStrip's recent entry into the disposable test strips market, *only* LifeScan's proprietary test strips worked with its OneTouch Ultra blood glucose monitoring devices.  Many consumers receive their OneTouch Ultra branded meters directly or indirectly from LifeScan for free or at substantially reduced costs.  The reduced or

---

[1] LifeScan made these assertions in a trademark action filed in the Northern District of California entitled *LifeScan, Inc., et al v. Shasta Technology, LLC, et al.*, Case No. 12-cv-6360 (JST).

3

non-existent cost of the meter is an important factor that makes them extremely attractive to consumers. Originally, LifeScan had no competition in the market for test strips used with its OneTouch Ultra meters. Only LifeScan's proprietary strips were compatible with OneTouch Ultra meters, forcing customers to use and buy only LifeScan brand test strips. This previous lack of competition had permitted LifeScan to maintain high volumes of profitable sales of their own significantly, more expensive disposable test strips.

10.     LifeScan took action to protect its dominant market position from UniStrip test strips and others by engaging in an anticompetitive and exclusionary scheme to restrain trade and monopolize the market for blood glucose test strips: for use in LifeScan's OneTouch Ultra family of blood glucose meters. LifeScan possesses virtually 100% of the market for test strips that are FDA-approved and compatible with its own OneTouch Ultra family of electrochemical glucose meters.

11.     In November 2013, UniStrip received FDA approval to market and sell "UniStrip1," a lower cost test strip designed to work exclusively with LifeScan's four most popular meters, the Ultra, Ultra 2, Ultra Smart and Ultra Mini, and to provide consumers with a cost-effective less expensive alternative to LifeScan's name-brand test strips. Other than UniStrip and Decision Diagnostics Corp., the exclusive distributor of the generic test strip GenStrip™, LifeScan has faced no competition from any other FDA approved test strip compatible with its OneTouch Ultra line of blood glucose monitors.[2] Despite competition from

_____

[2] The GenStrip, approved by the FDA, was another low-cost alternative to LifeScan's OneTouch brand test strip and is compatible with three models of the OneTouch Ultra meters. In April 2014, after one year in the market, the FDA advised consumers to stop using the GenStrip after testing determined that they may report incorrect blood glucose levels. The FDA warned that incorrect readings "could lead to inappropriate or delayed treatment that could significantly harm a patient." This action by the FDA effectively put GenStrip out of the market so that the UniStrip brand is currently the *only* viable competitor of LifeScan in the sale of strips for LifeScan's OneTouch Ultra meters.

UniStrip1 and for a period of time, GenStrip, LifeScan continues to dominate, control and monopolize the market for test strips compatible with its OneTouch Ultra family of meters.

12.     The release of UniStrip's generic lower-cost alternative to LifeScan's substantially higher priced test strips was expected to be well-received by distributors, wholesalers, mass merchandisers, pharmacies and managed care mail order service providers of health care products due to new payment changes for test strips caused by Medicare's mandated competitive bidding, which began July 1, 2013.  The Medicare mandate lowered reimbursement of supplies and medical goods for diabetics by nearly 67%.  This change significantly affected the "direct to patient" services channel, which represents more than 25% of the domestic diabetes testing market.  UniStrip anticipated a positive response to its UniStrip1 product by distributors and direct-to-patient fulfillment services who could offer a high-quality test strip compatible with LifeScan's OneTouch Ultra meters and still make a profit without forcing consumers to endure crippling co-payments.

13.     LifeScan is maintaining its dominant position as the leading market manufacturer and seller of blood glucose monitoring systems by restraining trade and attempting to monopolize the market for blood glucose disposable test strips: for use with LifeScan's OneTouch Ultra line of blood glucose meters.  LifeScan is maintaining a competitive advantage by engaging in an exclusionary scheme involving contracts, agreements and/or understandings with resellers of LifeScan's blood glucose monitoring systems that are intended to impair, and are in fact impairing and inhibiting, competition in the market for OneTouch Ultra compatible test strips.  During the relevant time period, LifeScan's arrangements with resellers threaten to revoke rebates and discounts and impose price penalties on resellers who purchase even a small quantity of non-LifeScan products usable with OneTouch Ultra glucose meters.  Unable to risk losing substantial rebates and

discounts on at least LifeScan's entire line of diabetes-related products, these resellers are precluded from accessing a cost-effective, FDA approved alternative test strip (UniStrip1) so that LifeScan can maintain profitable sales of its own, more expensive test strips. The purpose and effect of LifeScan's plan is to exclude and/or eliminate competition from suppliers offering cost-effective alternatives to LifeScan's disposable test strips so that it can protect its dominant position in the market.

14.     To thwart lower priced competition from plaintiff SPG on UniStrip brand test strips, defendant LifeScan has embarked on a campaign and plan consisting of at least the following anticompetitive, exclusionary and monopolistic acts: (a) conditioning the payment of rebates, discounts and price concessions on at least LifeScan's entire line of diabetic products on an agreement or understanding that the reseller not purchase or distribute any non-LifeScan products "compatible" with LifeScan meters, *i.e.* UniStrip1 test strips; and (b) coercively inducing resellers to boycott or refuse to resell UniStrip's lower priced test strip for fear of losing rebates and incurring price increases and penalties on an array of products purchased from LifeScan. Plaintiff SPG cannot match or offset LifeScan's elimination of rebates or discounts on these other products because it does not sell any of those other products. This multi-faceted scheme has been adopted and implemented by LifeScan to deprive distributors and retailers, and ultimately end-user consumers, of the choice to purchase a lower-cost alterative test strip compatible with LifeScan's OneTouch Ultra meters.

15.     By conditioning the rebates and discounts on a variety of diabetes-related and other products on an understanding or agreement that resellers do not purchase generic test strip products that are compatible with OneTouch meters, LifeScan has made the cost of buying UniStrip brand test strips prohibitively expensive. LifeScan's threat to take away rebates and discounts has made it

virtually impossible for plaintiff SPG, and other actual or potential rivals, to enter the market and sell test strips that work with OneTouch Ultra meters and, thus, fairly compete for test strip market share.  This has significantly affected competition in the relevant market and has permitted LifeScan to maintain inflated prices and its dominant market share on its own test strips.

16.     As a consequence of LifeScan's exclusionary conduct, competition in the relevant product market has been suppressed and virtually eliminated. Resellers, distributors and consumers in that market have suffered a loss of choice, and are required to pay higher prices for LifeScan test strips that would be lower in a truly competitive market.  Plaintiff SPG (exclusive distributor of the UniStrip brand disposable test strip), the competitive process, and consumers have suffered antitrust injury by reason of LifeScan's unlawful trade restraints and exclusionary conduct in violation of the federal antitrust laws.

## II.  JURISDICTION AND VENUE

17.     This Complaint is filed and this action is initiated under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against, the LifeScan defendants for their past and continuing violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14), and related state based-law claims, as alleged herein.

18.     This Court has original and exclusive jurisdiction over the subject matter of this civil action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337. This Court may exercise supplemental jurisdiction over the state law-based claims pursuant to 28 U.S.C. § 1367.  Defendant LifeScan transacts business on a systematic and continuous basis within this District, and may be found here, within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  The contracts and

conduct complained of, and the unlawful acts alleged herein were performed and occurred in material part, affect commerce within this District.

## III.  INTERSTATE COMMERCE

19.    The actions complained of herein have, and will, restrain and adversely affect interstate commerce because defendants distribute and sell test strips across state lines.  Further, defendants purchase goods and supplies in interstate commerce.

## IV.  THE PARTIES

20.    Plaintiff, Strategic Products Group, Inc., is a corporation organized and existing under the laws of Alabama with its principal place of business located in Pensacola, Florida.  Plaintiff, SPG, is the exclusive distributor and seller of the generic, lower-cost alternative test strip (UniStrip brand) that is fully compatible with LifeScan's four best-selling blood OneTouch Ultra blood glucose monitors: (a) Ultra, (b) Ultra2, (c) UltraSmart, and (d) UltraMini.  Beginning in at least January 2015, plaintiff SPG became UniStrip's exclusive domestic distributor for UniStrip brand test strips for all actual and potential accounts, with the exception of Walmart.  SPG and UniStrip have no common ownership and are not, legally or financially, related or affiliated with one another.

21.    Defendant, LifeScan, Inc. ("LifeScan"), a J&J company, is a corporation organized and existing under the laws of California with its principal place of business and headquarters in Chesterbrook, Pennsylvania.

22.    Defendant, LifeScan Scotland, Ltd., ("LifeScan Scotland") is a private limited company organized under the laws of the United Kingdom with its principal place of business at Beechwood Park North, in Inverness, Inverness-Shire, Scotland, United Kingdom.  LifeScan Scotland is a wholly owned subsidiary of J&J.  LifeScan Scotland conducts business with LifeScan, Inc. at its Chesterbrook, Pennsylvania location.

23.     Both LifeScan and LifeScan Scotland are wholly-owned subsidiaries of J&J.  J&J is one of the world's largest and most dominant manufactures of diverse health care products, including pharmaceutical, medical devices and consumer health products.  J&J is the world's second largest manufacturer of health care products and maintains industry leadership in many diverse segments including, but not limited to, blood glucose meters and tests strips for home use.  LifeScan and LifeScan Scotland are only two of hundreds of subsidiaries owned by J&J.  J&J is headquartered in New Brunswick, New Jersey.  J&J's sales/revenues in 2016 were approximately $72 billion.

## V.   RELEVANT MARKETS AND LIFESCAN'S MONOPOLY POWER

### A.   Relevant Product Market

24.     The sale of home blood glucose monitoring systems, which consists of blood glucose meters and test strips, is extremely dominated by four major competitors, LifeScan, Roche, Bayer and Abbott, making this an oligopolistic industry.  These pharmaceutical giants collectively share more than 83% of the total United States sales and 90% of the global sales.  LifeScan possesses more than a 35% share of the total domestic sales of glucose monitoring systems.

25.     The relevant product market in this case is disposable test strips compatible with LifeScan's OneTouch Ultra electronic test meters.

26.     All four of the major players who dominate the sales of blood glucose self-monitoring systems engage in similar selling structures.  According to LifeScan, it has long been industry practice that each competitor distribute its own glucose meters and test strips that work only with that particular manufacturers' meters.  This arrangement creates a closed system impervious to cost-effective competition from rivals like the UniStrip brand with the effect of enabling these four dominant players to maintain test strip prices at artificially inflated levels.

27.     Prior to November 2012, LifeScan controlled 100% of the relevant test strip market for its own meters.  At all relevant times, LifeScan possessed monopoly power—the ability to profitably raise and control prices significantly above competitive levels without losing significant sales in the market for test strips used in LifeScan OneTouch Ultra glucose meters and/or to exclude competition.  LifeScan also wields monopoly power sufficient to exclude competition.

28.     Products in the market for test strips used with LifeScan's OneTouch Ultra meters do not exhibit, positive cross-elasticity of demand with respect to price with products that are not in that market.  Test strips for LifeScan's OneTouch Ultra blood glucose meters are not substitutes for, and are not reasonably interchangeable with, disposable test strips used in meters made and sold by Bayer, Roche, Abbott or any other manufacturer.  Accordingly, there is no interbrand competition in the disposable test strip market.

29.     LifeScan artificially depresses the prices for their OneTouch Ultra meters in a variety of ways including, but not limited to, rebates/discounts to insurance companies, pharmacies, wholesalers and distributors.  LifeScan also engages in a strong on-the-ground effort to promote its meters by providing OneTouch Ultra devices to doctors and health care facilities at highly discounted rates or free of charge so that they can easily prescribe and/or distribute them to their diabetes patients.  By making its OneTouch Ultra monitors easily accessible and available to end-users, LifeScan knows that a patient will only be able to use LifeScan's proprietary disposable test strips, which can be costly depending on how often a patient checks glucose levels.  This marketing and pricing strategy is an effective sales tool that contributes to LifeScan's market dominance.

30.     The low or zero cost of the meter is significant because it makes the LifeScan brand more attractive to consumers.  In other litigation, LifeScan has

admitted that its revenues from blood glucose monitoring systems comes primarily from the sales of its proprietary disposable test strips.  Until recently, consumers with LifeScan's OneTouch Ultra meters have had no other choice but to purchase and use LifeScan's expensive test strips in order to use their OneTouch Ultra meters and obtain test results.

31.     In November 2012, UniStrip received FDA approval for its low cost, high quality alternative test strip, UniStrip1, for use with LifeScan's OneTouch Ultra, Ultra2, UltraSmart, and UltraMini meters.   The FDA subjected UniStrip1 Test Strips to the same clinical testing, scrutiny and approval process as the name brands.  Lower cost, however, does not mean lower quality.  Tests indicated that the UniStrip1 used with the OneTouch Ultra meters provides accurate results that are nearly identical to the results obtained using the OneTouch Ultra monitors with the name brand Ultra test strips manufactured by LifeScan.  Consumers can realize the savings of buying UniStrip1 brand test strips without having to buy a new meter or worry they will incur high out-of-pocket costs by having to purchase additional test strips not covered by their insurance plan.  The option of a lower priced test strip may also increase the level of testing and compliance for many people suffering from diabetes.  In addition to providing accurate testing of glucose levels, the UniStrip test strip products are listed at price points by plaintiff SPG significantly below—as much as 80% -- those of LifeScan test strips.  With a "generic" alternative UniStrip brand disposable test strip now available, consumers now have a choice to purchase lower priced test strips that are compatible with their LifeScan OneTouch Ultra meters.

32.     Many pharmacies, retailers and wholesalers want to continue to make LifeScan's branded test strips available and sell them side-by-side with UniStrip's lower priced generic test strips.  This would allow consumers to choose among competing test strips for use with their LifeScan's Ultra meters.  However,

LifeScan's exclusionary conduct has substantially foreclosed a lower-cost, possibly superior alternative compatible test strip, from the relevant market and enabled LifeScan to maintain its market share while simultaneously raising the price of LifeScan OneTouch Ultra test strips.  This anticompetitive conduct forces consumers and insurance healthcare plans to overpay for LifeScan branded test strips that must be used in LifeScan's OneTouch Ultra meters.

        1.     **High Barriers to Test Strip Market Entry**

      33.    In the aforementioned relevant market, barriers to entry, including high fixed costs, intellectual property, high risk of failure in the development process and having to overcome regulatory hurdles, render the entry of any new competitor difficult.  Blood glucose monitoring products must meet extremely stringent regulatory and safety requirements set forth by the FDA.  There is no abbreviated process by which blood glucose monitoring products can obtain FDA approval.  Every product, including test strips, must go through the entire FDA process of testing to ensure compliance with rigorous standards.  With only four major players dominating the sales in the U.S., the blood glucose monitoring business is highly concentrated making the barriers to entry by a new competitor extremely high and difficult.

**B.**     **Relevant Geographic Market**

      34.    The relevant geographic market is the entire United States in which LifeScan conducts business.

## VI.  NATURE OF TRADE AND COMMERCE

**C.**     **Demand for Blood Glucose Monitoring Systems**

      35.    In 2010, the United States was estimated to be the largest market for blood glucose monitoring systems in the world, with the test strip market segment making up almost 90% of the market.  Today, the United States accounts for

44.6% of the global blood glucose monitoring product sales and continues to increase.  Domestically, one in every five dollars spent on healthcare is for the care of people diagnosed with diabetes.  The average annual medical spending in the U.S. for a person with diabetes is about $13,700, which is 2.3 times that of people without diabetes.  According to the American Diabetes Association, it is predicted that about 29.6 million people in the U.S. will suffer from diabetes by 2030.

36.     Controlling blood glucose levels in the body is key to managing diabetes and preventing complications.  Anyone with diabetes can benefit from regular glucose level testing.  The use of at-home self-monitoring has proven to be effective in controlling glucose values and managing diabetes.  Among the benefits of at-home testing is that patients can understand the symptoms of hyperglycemia and hypoglycemia and make adjustments to their diet, exercise routine and diabetes treatment plan based on their glucose levels.  In doing so, diabetes patients significantly lower the risk of seizures, blindness, kidney disease, and nerve damage.

37.     Electronic self-monitoring blood glucose systems quantitatively measure glucose in fresh capillary whole blood samples taken from the finger, palm, or forearm.  Most manufacturers of blood glucose meters desire to increase the level of compliance through regular testing.  Today, blood glucose meters are smaller, faster, require smaller blood samples and are more accurate than those in years past.

38.     Though more people with diabetes are aware of the benefits of at-home self-testing, the high cost of name-brand monitoring systems continues to deter some patients from regularly and frequently testing their glucose levels. Despite the increase in diabetes cases, health care plans continue to reduce financial subsidies for blood glucose meters and test strips.  What makes blood glucose monitoring expensive is not the cost of the meter itself, but the disposable

test strips, which many diabetes patients use several or more, times a day. This makes it even more important that a lower-cost test strip option be available to consumers. At up to $165 for 100 name-brand test strips, the cost can add up to about $2,500 or more per year for people who test multiple times a day. Although Medicare covers some diabetes-related supplies and private insurance may cover some of the cost, many plans cover nothing at all or only certain brands of blood glucose meters and test strips. Many health care plans will only cover a certain quantity of test strips, if any, per month, leaving patients who require more than the covered amount of strips to purchase them out-of-pocket. Notably, consumers with insurance coverage are more likely to find that LifeScan diabetes products on their health plan's formulary than those made by any other company. Moreover, LifeScan's glucose testing products lead the market for physician prescriptions.

39.     Due to cost, U.S. patients failed to fill 6.8% of name-brand prescriptions for diabetes supplies in the 2008 fourth quarter, a 22% increase from the first quarter 2007. Actions like these come at the expense of patient health and add to the annual economic cost of the disease-$245 billion spent on persons diagnosed with diabetes in 2012. This figure includes more than $29 billion for diabetes supplies and $44 billion for prescription-diabetes medications. Indirect costs resulting from increased absenteeism, reduced productivity, disease-related unemployment disability, and loss of productive capacity due to early mortality add up to $69 billion.

40.     The direct and indirect costs of diabetes care is increasing with the rise in prevalence and the development of various complications to the disease. Due to increased spending by governments to keep the disease in check and losses to a minimum, sales of blood glucose monitoring systems have and will continue to increase.

41.     In a competitive market, blood glucose monitoring options should not be cost-prohibitive.  Generic blood glucose test strips cleared by the FDA for use with brand name meters—such as UniStrip1 disposable test strips—when used as intended, provide a cost-effective alternative that can save diabetes patients hundreds to thousands of dollars per year on test strips alone (when compared to LifeScan name-brand strips).  The choice of a lower-priced test strip alternative is particularly important as health care plans continue to reduce benefits forcing patients to pay for diabetes supplies out-of-pocket.  Indeed, the paramount focus of the antitrust laws is consumer welfare.

**D.**     **LifeScan's Anticompetitive and Exclusionary Conduct**

      **1.**     **LifeScan Has Willfully Maintained its Monopoly Power in the Test Strip Market Through Unlawful Exclusive Dealing and Bundling Arrangements**

42.     LifeScan has entered into exclusionary written contracts and/or verbal agreements with large distributors, wholesalers, pharmacy chains (national and regional) and direct-mail suppliers of health care related products, which penalize these resellers for purchasing generic diabetes supplies, *i.e.* disposable test strips, "compatible" with OneTouch Ultra meters from rivals.  Under LifeScan's exclusionary contracts, purchasers face steep price penalties by way of a reduction or termination of rebates, discounts and allowances and/or imposition of price increases on at least LifeScan's entire line of blood glucose monitoring supplies (and possibly other healthcare products purchased from LifeScan) if they purchase non-LifeScan products compatible with LifeScan glucose meters from another supplier.

43.     During the relevant time period, LifeScan's exclusionary contracts with resellers include terms or provisions that expressly or impliedly condition the payment of rebates, discounts, and other financial incentives on the agreement

and/or understanding that the customer *not* purchase sell non-LifeScan products "compatible" with OneTouch Ultra blood glucose meters.  LifeScan has informed many purchasers that reselling non-LifeScan brand products usable use with its OneTouch Ultra meters violates their contract with LifeScan even where there is no express provision to this effect.  LifeScan has also made these threats in-person, over the phone, in e-mails and other written correspondence notwithstanding any express penalty term in the agreement with the reseller.

44.    There is no legitimate business justification for LifeScan conditioning the payment of rebates, discounts and price concessions on its entire line of diabetes supplies (and possibly other healthcare products) on the customer's agreement not to purchase generic products from other suppliers, *i.e.,* UniStrip brand test strips from plaintiff SPG, that can be used with OneTouch Ultra meters. The only purpose of LifeScan's anticompetitive exclusionary scheme is to foreclose lower-priced competition from the UniStrip brand test strips and for LifeScan to maintain its supracompetitive pricing structure on its test strips and dominant market position.

45.    As a result of this, exclusionary scheme, distributors and retailers of LifeScan diabetes products are precluded from purchasing test strips from LifeScan's rivals (*i.e.* UniStrip brand) because such purchases would result in the assessment of punitive pricing consequences in the form of increased prices on many LifeScan diabetes supplies and/or other healthcare products. LifeScan has conditioned the payment of rebates, discounts, and other financial incentives on products that its resellers cannot purchase from another supplier, *i.e.* plaintiff SPG selling the UniStrip brand compatible disposable test strips.

2.    **LifeScan's Exclusionary Scheme Has Foreclosed a Substantial Amount of Competition in the Relevant Disposable Test Strip Market**

46.    Until 2013, LifeScan was the sole manufacturer and supplier of test strips compatible with its own OneTouch Ultra blood glucose meters.  The only other companies to manufacture an alternative test strip compatible with OneTouch Ultra meters are UniStrip and Decision Diagnostics, which made the "GenStrip," another lower cost alternative to LifeScan brand test strips.  In April 2014, however, the FDA advised consumers to stop using the GenStrip because it was providing inaccurate glucose readings.  GenStrip was essentially pulled from the market at the same time plaintiff began marketing the UniStrip1 test strips to resellers.  UniStrip1 was subjected to the FDA's rigorous testing standards in 2012-2013 whereas LifeScan received FDA approval for its OneTouch Ultra test strips in the early 2000's when the standards were not as stringent.  Several studies have concluded that UniStrip1 provides a more accurate blood glucose reading than LifeScan's own name brand disposable test strips.

47.    LifeScan's exclusionary contracts and arrangements with resellers has had the purpose and effect of unfairly impeding SPG's ability to penetrate and compete in the market for test strips compatible with Lifescan's OneTouch Ultra meters.  LifeScan is aware that by providing rebates, discounts and allowances on diabetes supplies, SPG is blocked from competing because a purchaser who buys plaintiff's UniStrip brand test strips will not only risk losing rebates/discounts on LifeScan's expensive name-brand test strips, but also on other diabetes supplies and/or other LifeScan and/or J&J healthcare products that the customer cannot purchase from plaintiff.  Because SPG does not distribute or sell any LifeScan/J&J products, it is impossible for SPG to compensate resellers to make up for, or offset, LifeScan's price penalties on those other products (loss of rebates/discounts).

17

48.    By reason of LifeScan's exclusionary scheme, the aggregate penalty that a purchaser pays for buying UniStrip1 test strips is so large that a hypothetical equally efficient rival would have to sell below its costs (and potentially even pay the buyer) to purchase generic test strips from SPG just to create a level playing field with LifeScan.  This is because the equally efficient competitor would need to compensate the buyer for all the rebates, discounts and other financial incentives the buyer would lose from LifeScan by electing to buy the rival's lower-cost alternative disposable compatible test strip.

49.    As a result of its anticompetitive exclusionary scheme, LifeScan has expanded its monopoly power and continued to raise prices on its OneTouch Ultra test strips despite the entrance of new competitors into the market, GenStrip in 2013 and the UniStrip brand in 2014.  These higher prices are ultimately passed to the consumers, *i.e.* persons using LifeScan's OneTouch Ultra blood glucose monitoring systems.

50.    Given that the large distributors, direct-to-patient suppliers and major national pharmacy chains purchase products from LifeScan that they cannot obtain from another supplier or which are not reasonably interchangeable with another brand or product, LifeScan's exclusionary arrangements have made it impossible for plaintiff SPG (UniStrip brand) to penetrate the market and effectively compete with the name brand OneTouch Ultra test strips.

51.    LifeScan's exclusionary contracting scheme has substantially foreclosed lower-cost and arguably superior generic test strips compatible with OneTouch Ultra blood glucose meters from the market.  At the same time, LifeScan has maintained and increased its share in the market for test strips used with its OneTouch Ultra meters.

# VII.  CLAIMS FOR RELIEF

## COUNT I
### (Unlawful Exclusionary Arrangements in Violation of
### Section 3 of the Clayton Act (15 U.S.C. § 14))

52.     Plaintiff, SPG, hereby alleges and incorporates by reference each allegation set forth in Paragraphs 1 through 51 of this Complaint, as if set forth in full herein.

53.     Section 3 of the Clayton Act (15 U.S.C. § 14), makes it unlawful, *inter alia*, "[f]or any person . . . to . . . make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor . . . of the . . . seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly" in the relevant market.  Under Section 3, the "conditioning" of the offer, allowance or payment of rebates or discounts to preclude or exclude the use of a competitor's products is also unlawful.  Arrangements and contracts whose probable effect is to foreclose competition in a substantial share or segment of the line of commerce affected violate Section 3 of the Clayton Act.

54.     The relevant product market (or submarket) for antitrust purposes in this case is defined as: the disposable test strips cleared by the FDA for use with LifeScan's OneTouch Ultra, Ultra2, UltraSmart and UltraMini glucose test meters. LifeScan touts itself as the leader in the "market for blood glucose monitoring systems," which includes its blood glucose meters and test strips used with those meters.  LifeScan also represents that its OneTouch brand test strips are the #1 most prescribed test strips in the U.S.  LifeScan claims market superiority based its meters' fastness, ease of use, and accuracy.   No test strips other than those produced by LifeScan and UniStrip are reasonably interchangeable or presently FDA cleared for use with the above-identified LifeScan OneTouch glucose test

meters.  There are no substitutes for these disposable test strips.  The relevant market only consists of commodities reasonably interchangeable by consumers for the same purpose.  There is a very low cross-elasticity of demand between test strips used with OneTouch Ultra meters and test strips incompatible with those meters.

55.     The relevant geographic market for antitrust purposes is the United States.

56.     LifeScan dominates the sales of test strips in the United States and its share for its disposable test strips compatible with its four LifeScan Ultra branded meters is virtually 100%.

57.     Plaintiff, SPG, has the requisite standing to assert antitrust claims against defendant LifeScan because it is a competitor in the relevant market because it distributes/sells UniStrip brand test strips which directly compete with LifeScan's test strips for use with Ultra meters.

58.     The anticompetitive scheme and plan of defendant LifeScan to substantially lessen competition and create a monopoly in the above-described trade and commerce has and continues to be done with the intent to specifically eliminate plaintiff SPG as a threat and viable competitor to LifeScan's disposable test strip business, and to reduce competition in that market in general.  LifeScan's conduct has lessened choices for test strips for its test meters and made resellers resistant to stocking and selling UniStrip's competing test strips.  LifeScan's overall anticompetitive scheme consists of at least the following acts/conduct to be viewed as a whole:

(a)     LifeScan successfully threatened, intimidated and coerced actual and potential purchasers of UniStrip test strips not to buy non-LifeScan products "compatible" with OneTouch Ultra meters, including UniStrip1 test strips, for fear they would lose rebates, discounts, and pricing concessions on

20

LifeScan's line of diabetes supplies and/or other healthcare products, which they cannot obtain from another supplier;

(b)     Plaintiff, SPG, has existing, valuable and reasonable expectations of further and future relationships with buyers/distributors of test strips in the U.S.  For example, Walgreens advised that it feared that LifeScan would terminate rebates on its entire line of diabetes products if it purchased or supplied non-LifeScan products for use in LifeScan meters.  Other prospective customers represented to plaintiff or others that there were restrictions in their contract with LifeScan that precluded them from buying UniStrip brand products because doing so would cause LifeScan to revoke their rebates and discounts and increase pricing on other products they purchased from LifeScan.  These customers rely on certain LifeScan products and the rebates/discounts associated with those products, which cannot be obtained from another supplier and/or not interchangeable with other products or brands.  In short, LifeScan has used both the actual contractual restraints and threats to reduce/terminate rebates/discounts as means to secure exclusion of plaintiff and ensure exclusivity for LifeScan brand test strips; and

(c)     conditioned the payment of rebates, discounts, on at least LifeScan's line of diabetes supplies and/or other healthcare products on the agreement by distributors, wholesalers, retailers, and other resellers, not to purchase generic products, *i.e.* alternative test strips, that are compatible with its OneTouch Ultra blood glucose meters.

59.     Exclusive dealing arrangements have the effect of inducing or coercing a buyer to purchase most, or all, products for a period of time from one supplier.  The arrangement may take the form of a requirements contract committing the buyer to purchase all (or a substantial portion) of its requirements of a specific product only from one supplier.  Such unlawful arrangements also

include pricing, discounting or rebate policies that create a substantial disincentive to purchase products from competitive sources.

60.     Exclusionary arrangements do not actually have to achieve total exclusivity to be deemed unlawful under Section 3 of the Clayton Act.  Moreover, "de facto" or implied arrangements, understandings and/or contracts are also anticompetitive if they create or maintain market power resulting in the exclusion of rivals even if not express.

61.     Exclusionary arrangements or contracts can be found illegal even though the contract/arrangement does not contain specific agreements or provisions not to use the products of a competitor, if the practical effect is to prevent such use or purchase.  Defendant LifeScan's anticompetitive and exclusionary conduct described herein is not motivated or driven by technological or efficiency concerns, and has no valid or legitimate business justification. Rather, its purpose and effect is to ensure that plaintiff SPG and other potential competitive rivals in the relevant market cannot successfully invade or erode defendant LifeScan's dominant and entrenched market position, which enables it to charge supra-competitive prices for its disposable test strips.

62.     During the relevant time period, defendant LifeScan and plaintiff SPG have both marketed and sold competing disposable test strips in the U.S.  The marketing, distribution and sale of such products directly involves, and substantially affects, interstate commerce.  The violations of the Clayton Act alleged herein adversely, directly and substantially affect the flow of such products in interstate commerce.

63.     The aforesaid conduct of LifeScan has produced antitrust injury, and unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition and consumers in interstate commerce:

(a)     competition in the development and output of disposable test strips has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)     barriers to entry into the relevant markets have been raised;

(c)     consumer choice has been, and will continue to be, significantly limited and constrained as to selection and price of disposable test strips;

(d)     consumer access to UniStrip brand competitive test strip products will be artificially restricted and reduced and its products will continue to be excluded from the market;

(e)     the market for development and sale of test strip products will continue to be artificially restrained; and

(f)     LifeScan will continue to charge supracompetitive prices for its disposable test strips to the detriment of consumers.

64.     Defendant, LifeScan's, practices have foreclosed competition in a substantial share of the relevant markets and have substantially lessened competition and tended to create a monopoly for LifeScan in the relevant product market and/or sub-market for compatible test strips.

65.     Conduct that restricts consumer choice or makes the market unresponsive to consumer preference harms consumers and results in antitrust injury.  When an agreement detrimentally changes the market makeup and limits consumers' choice to one source of output this causes cognizable antitrust injury by preventing its victims from making free and unhindered choices between market alternatives.

66.     Defendant, LifeScan's, predatory and exclusionary agreements, arrangements and contracts have caused antitrust injury to plaintiff SPG, competition and consumers.

67.    By reason of, and as a direct and proximate result of Defendant, LifeScan's, practices and conduct, plaintiff SPG has suffered, and will continue to suffer, financial injury to its business and property.  As a result, plaintiff has been deprived of revenues and profits it would have otherwise made, suffered diminished market growth and sustained a loss of goodwill.  Plaintiff has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it is able to do so, it will seek leave of the Court to insert the amount of the damages sustained herein.

## COUNT II
### (Trade Restraining Contracts and Agreements in Violation of Section One of the Sherman Act (15 U.S.C. § 1))

68.    Plaintiff, SPG, hereby alleges and incorporates by reference each allegation set forth in Paragraphs 1 through 67 of this Complaint, as if set forth in full herein.

69.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, contracts or agreements that unreasonably restrain competition to the detriment of consumers.

70.    LifeScan's conduct has been highly successful in excluding and/or eliminating competition in the relevant market by forcing or inducing customers to choose LifeScan's higher priced test strips over the substantially lower priced UniStrip brand test strips offered by plaintiff SPG.

71.    The relevant product market for antitrust purposes in this case is defined as: blood glucose disposable test strips approved by the FDA for use with LifeScan's OneTouch Ultra, Ultra2, UltraSmart and UltraMini glucose test meters. No test strips other than those produced by LifeScan and UniStrip are reasonably interchangeable or presently FDA cleared for use with the above-identified LifeScan glucose test meters.  There are no substitutes for these test strips.  The

relevant market consists only of commodities reasonably interchangeable by consumers for the same purpose. There is a very low cross-elasticity of demand between test strips used with OneTouch Ultra meters and test strips incompatible with those meters.

72.    The relevant geographic market for antitrust purposes is the United States.

73.    Defendant, LifeScan, has sufficient economic power in the relevant market.  Its share for its test strips compatible with these four LifeScan ultra branded meters is virtually 100%.  LifeScan has a significant economic interest in the market and clearly dominates and controls this market.  Plaintiff SPG has the requisite standing to assert antitrust claims against defendant LifeScan because it is a participant and competitor in the relevant disposable test strip market.

74.    The anticompetitive scheme and plan of defendant LifeScan to unreasonably restrain trade in the above-described trade and commerce has been done with the intent to specifically eliminate plaintiff SPG as a viable competitor and threat to LifeScan's test strip business, and to reduce competition to the detriment of consumers.  These agreements and combinations constitute unreasonable restraints of trade.  The overall anticompetitive scheme of LifeScan consists of at least the following acts/conduct to be viewed as a whole:

(a)    Successfully threatened, intimidated and coerced actual and potential purchasers of UniStrip brand test strips not to buy non-LifeScan products "compatible" with OneTouch Ultra meters, including UniStrip1 test strips, for fear they would lose rebates, discounts, and price concessions on LifeScan's line of diabetes supplies and/or other healthcare products, which they cannot obtain from another supplier;

(b)    Plaintiff, SPG, has existing, valuable and reasonable expectations of further and future relationships with buyers/distributors of test

strips.  For example, Walgreens had advised that it feared that LifeScan would terminate rebates on its entire line of diabetes products if it purchased or supplied non-LifeScan products for use in LifeScan meters.  Other prospective customers represented to plaintiff or others that there were restrictions in their contract with LifeScan that precluded them from buying compatible UniStrip products because doing so would cause LifeScan to revoke their rebates and discounts and increase pricing on other products they purchased from LifeScan.  These customers rely on certain LifeScan products and the rebates/discounts associated with those products, which cannot be obtained from another supplier and/or not interchangeable with other products or brands.  In short, LifeScan has used both the actual contractual restraints and threats to reduce/terminate rebates/discounts as means to secure exclusion of plaintiff and ensure exclusivity for LifeScan brand test strips; and

(c)     Conditioned the payment of rebates, discounts, on at least LifeScan's entire line of diabetes supplies and/or other healthcare products on the agreement by distributors, wholesalers, retailers, and other resellers, not to purchase generic products, *i.e.* alternative test strips, that are compatible with its OneTouch Ultra blood glucose meters.

75.    This case does not challenge the actual prices or level of prices charged by defendant, but revolves around its threats to terminate rebates and discounts on LifeScan diabetes supplies (and other healthcare products) to resellers who purchase non-LifeScan products test strip compatible with OneTouch Ultra meters.  So far as plaintiff now knows, no such rebates or discounts have yet been terminated but if that were to occur, the prices paid by purchasers would be higher, not lower.  Accordingly, plaintiff is not asserting a predatory or below-cost pricing claim.  Among other things, it is LifeScan's contractual provisions and threats of terminating rebates, discounts, and other financial incentives, and thereby

threatening to substantially increase prices, that is being used by LifeScan as a scheme to maintain its exclusivity on disposable test strip sales.

76.    As a direct result of the foregoing anticompetitive conduct and restrictions on competition, consumers pay substantially higher prices – about 500% to 600% more—for LifeScan test strips than they would in a fully competitive and open market.  The contracts and agreements have limited, if not eliminated, the availability of UniStrip1 brand disposable test strips, and restricted consumer choice of test strips.  There are no legitimate business, technological or efficiency reasons or justifications that require defendant LifeScan to impose these anticompetitive conditions and restrictions.

77.    LifeScan's restrictions, threats and arrangements have created a barrier that precludes effective entry by plaintiff SPG distributing/selling UniStrip brand test strips and other competitors into the relevant market, and the quality and variety of offerings in that market have been reduced and constrained.

78.    Defendant, LifeScan's, arrangements are unlawful under the antitrust laws when assessed under the "Rule of Reason."  The anticompetitive consequences of LifeScan's conduct outweigh any procompetitive effects thereof. Due to LifeScan's significant market power in the relevant market and the dominant position it has obtained, competition in that market has been significantly impaired by defendant's conduct.  The four dominant manufacturers of blood glucose monitoring systems, LifeScan, Roche Diagnostics, Abbott Diagnostics and Bayer each have a unique system in which the test strips of one manufacturer are not interchangeable or compatible with the strips of any other manufacturer, or their meters.  Once a customer acquires a blood glucose meter, that customer is locked into using strips that are compatible with that manufacturer's branded meter only.  Therefore, the test strips of each manufacturer each constitute a separate relevant sub-market.  Moreover, because of the physician's prescription, and the

27

popularity, acceptance, and sizeable demand for LifeScan blood glucose monitors, wholesalers and retailers have a significant economic need to have access to LifeScan brand test strips for resale. Finally, in some instances, insurers will enter into arrangements with LifeScan so that the insured consumer is locked into using LifeScan test strips with the LifeScan's OneTouch Ultra meters because that is the only brand of diabetes supplies that the health care plan will cover. In many instances, however, a patient requires more test strips per month than a health care plan will cover and the patient must pay for the additional supplies out-of-pocket. Without a lower cost test strip alternative, the patient is forced to either pay for LifeScan's expensive test strips or, as often is the case, or simply will not comply with testing glucose levels as often as is necessary.

79. The aforesaid conduct of LifeScan has produced antitrust injury, and unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a)     competition in the development, sale and marketing of disposable test strips has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)     barriers to entry into the test strips market have been raised;

(c)     consumer choice has been, and will continue to be, significantly limited and constrained as to availability, selection, price and quality of test strips;

(d)     consumer access to competitive test strip products, such as the UniStrip brand, will be artificially restricted and reduced;

(e)     the market for development and sale of test strips will continue to be artificially restrained; and

(f)     LifeScan will continue to gouge consumers by charging supra-competitive prices for its branded test strips.

28

80.     Defendant, LifeScan's, restrictions and arrangements affect a substantial volume of interstate commerce in the relevant market.

81.     Defendant, LifeScan's, predatory and exclusionary conduct has caused antitrust injury to plaintiff SPG, competition generally, and consumers. Predatory or anticompetitive conduct is that which unfairly tends to be exclusionary or tends to destroy competition.

82.     By reason of, and as a direct and proximate result of Defendant, LifeScan's, practices and conduct, plaintiff SPG has suffered, and will continue to suffer, financial injury to its business and property.  As a result, plaintiff has been deprived of revenues and profits it would have otherwise made, suffered diminished market growth and sustained a loss of goodwill.  Plaintiff SPG has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

## COUNT III
### (Monopolization and Attempted Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2))

83.     Plaintiff, SPG, hereby realleges and incorporates by reference each allegation set forth in Paragraphs 1 through 82 of this Complaint, as if set forth in full herein.

84.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, monopolization and attempts to monopolize any part of the trade or commerce among the States.  Defendant LifeScan's conduct and practices are anticompetitive, predatory and/or exclusionary.

85.     Plaintiff, SPG, has the requisite standing to assert antitrust claims against defendant LifeScan because it is a participant and direct competitor in the relevant test strip market.

86.   LifeScan has monopolized and/or is attempting to monopolize the market for test strips compatible with its OneTouch Ultra blood glucose meters by engaging in an anticompetitive and exclusionary scheme to preclude competition in the relevant market.  Given LifeScan's dominant economic position, which LifeScan touts as the leader in the "market for blood glucose monitoring systems," there is a dangerous probability that LifeScan will succeed in maintaining or expanding its monopoly in the relevant markets, including the power to set prices, reduce output, and/or exclude competition in the test strip market.  A dangerous probability of monopoly power exists where the defendant possesses a significant market share when it undertakes the challenged anticompetitive conduct.

87.   Defendant, LifeScan, has undertaken its anticompetitive and exclusionary conduct with the purpose of monopolizing, and with the deliberate and specific intent to monopolize the market for test strips compatible with its OneTouch Ultra blood glucose meters.  LifeScan specifically intends to eliminate, destroy or foreclose meaningful competition in the relevant market through the tactics and agreements alleged herein.  LifeScan's conduct discourages and/or precludes buyers/distributors of diabetic test strips from dealing or contracting with competing suppliers of strips compatible in OneTouch Ultra meters, such as the UniStrip brand.  LifeScan's scheme is designed to exclude and thwart competition while enabling it to charge supra-competitive prices for its own disposable test strips.

88.   The relevant product market for antitrust purposes in this case is defined as: blood glucose disposable test strips cleared for use with LifeScan's OneTouch Ultra, Ultra2, UltraSmart and UltraMini glucose test meters.  No test strips other than those produced by LifeScan and UniStrip are reasonably interchangeable or FDA approved for use with LifeScan OneTouch Ultra meters.  There are no substitutes for these test strips.  The relevant market only consists of

commodities reasonably interchangeable by consumers for the same purpose. There is a very low cross-elasticity of demand between test strips used with OneTouch Ultra meters and test strips incompatible with those meters. The relevant geographic market for antitrust purposes is the United States.

89.    As described above, significant and high barriers to market entry exist that preclude or discourage new manufacturers from entering the relevant market. Significant barriers to expansion also exist because only a small number of competitors have managed to marginally penetrate this market.

90.    Defendant, LifeScan's, anticompetitive acts affect a substantial amount of interstate commerce in the relevant market and constitute attempted monopolization in violation of Section 2 of the Sherman Act. Defendant LifeScan's conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification. Instead, its purpose and effect is to further or preserve its dominant position and stranglehold, and to injure consumer welfare, Plaintiff, SPG, and other competitive rivals in the relevant market.

91.    Defendant, LifeScan's, anticompetitive acts have caused substantial economic injury to plaintiff SPG, and have also injured competition in the relevant markets by, *inter alia*, foreclosing, lessening and eliminating potential competition and depriving consumers from securing lower cost disposable test strips.

92.    The aforesaid conduct of LifeScan has produced antitrust injury, and unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a)    competition in the development of test strips has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)    barriers to entry into the relevant markets have been raised;

(c)     consumer choice has been, and will continue to be, significantly limited and constrained as to availability, selection and price of test strips;

(d)     consumer access to UniStrip brand competitive test strips will be artificially restricted and reduced and its products will continue to be excluded from the market;

(e)     the market for development and sale of test strips in the relevant market will continue to be artificially restrained or monopolized; and

(f)     LifeScan will continue to charge supra-competitive prices to the detriment of consumers.

## COUNT IV
**(Tortious Interference with Actual and Prospective Business Relationships)**

93.     Plaintiff, SPG, hereby alleges and incorporates by reference each allegation set forth in Paragraphs 1 through 92 of this Complaint, as if set forth in full herein.

94.     This Court has jurisdiction over this Count IV based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because it arises from the same transactions and from a common nucleus of operative facts as alleged in the first three federal causes of actions.

95.     Plaintiff, SPG, had potential and existing, valuable and reasonable expectations of further and future relationships with buyers/distributors of UniStrip brand test strips.  SPG's potential customers include, but are not limited to, Walgreens; Buy Rite Drugs; Discount Drug Mart; Arriva Medical; Gretna Pharmacy; Commonwealth Pharmacy; Piedmont Pharmacy; Modern Pharmacy; Commonwealth Pharmacy Chatham; Burlington Drug Co.; AmerisourceBergen; Giant Eagle, Inc.; Lewis Drug; Smith Drug Co.; CVS; H.E.B.; Xpress Medical Supply; Smart-Fill; and NC Mutual Wholesale Drug Co.  For example, Walgreen's

advised that it feared that LifeScan would terminate rebates on its entire line of diabetes products if it purchased or supplied non-LifeScan products for use in LifeScan meters.  Other prospective customers represented to plaintiff or others that there were restrictions in their contract with LifeScan that precluded them from buying UniStrip products because doing so would cause LifeScan to revoke their rebates and discounts and increase pricing on other products they purchased from LifeScan.  These customers rely on certain LifeScan products and the rebates/discounts associated with those products, which cannot be obtained from another supplier and/or not interchangeable with other products or brands.  In short, LifeScan has used both the actual contractual restraints and threats to reduce/terminate rebates/discounts as means to secure exclusion of plaintiff and ensure exclusivity for LifeScan brand test strips.

96.    After SPG began distributing/selling UniStrip1 test strips, a LifeScan representative called UniStrip and notified it of language in LifeScan's agreements with its customers prohibiting them from reselling non-LifeScan products compatible with OneTouch Ultra meters, and that violation of this provision would result in the termination of rebates and discounts on diabetes supplies to these customers.  LifeScan further informed UniStrip that it was going to enforce these agreements against customers due to sales of UniStrip1 test strips.

97.    Several prospective customers, including Walgreens and NC Mutual Wholesale Drug informed UniStrip, or an UniStrip agent, that although LifeScan had told them that purchasing and reselling non-LifeScan products compatible with LifeScan's OneTouch Ultra meters violated their agreements with LifeScan, they could not find any express or implied provision to this effect.

98.    Defendant, LifeScan, was aware of plaintiff's prospective business relationships with these customers and engaged in intentional and wrongful

conduct designed or calculated to disrupt and interfere with those relationships without any legitimate justification.

99.    Defendant, LifeScan's, wrongful conduct in interfering with such prospective business relationships is intentional, unjustified, and malicious. LifeScan's conduct and overall scheme was specifically undertaken solely to hinder, if not eliminate, competition so that LifeScan can continue to reap supracompetitive prices and profits on test strips.  LifeScan's anticompetitive conduct is independently improper and wrongful and was without any legitimate business justification.  LifeScan has knowingly engaged in such wrongful conduct for the purpose of excluding competition and to deprive consumers of the benefits of free and open competition for test strips.

100.    Defendant, LifeScan's, conduct was a substantial factor in proximately causing financial injury to plaintiff SPG and has rendered it more difficult for plaintiff to remain and survive as a viable competitor.  LifeScan's purposeful wrongful actions harmed SPG's existing relationships with customers and prevented prospective economic relationships from occurring.

101.    Plaintiff, SPG, business and goodwill has been, and will continue to be, substantially injured by LifeScan's conduct.  Additionally, prospective customers of plaintiff SPG will continue to be injured and harmed by LifeScan's improper and unjustified acts and practices.  Although Plaintiff, SPG, has incurred substantial losses as a proximate result of the foregoing acts, and will continue to incur substantial losses in the future as well as its growth being negatively impacted, all such losses may be difficult to calculate with precision.  Therefore, in addition to any recoverable damages proximately caused by LifeScan's wrongful conduct, plaintiff SPG also seeks a permanent injunction preventing LifeScan from continued interference in the future.

102.   The intentional and disruptive conduct of defendant LifeScan is willful, malicious and oppressive.  Consequently, an award of exemplary or punitive damages in an amount sufficient to punish and deter LifeScan is warranted.

## COUNT V
### (Attempted Monopolization and/or Actual Monopolization in Violation of Florida Antitrust Act of 1980)

103.   Plaintiff, SPG, hereby alleges and incorporates by reference each allegation set forth in paragraphs 1 through 102 of this Complaint, as if set forth in full herein.

104.   This Court has jurisdiction over this Count V based on the Doctrine of Supplemental Jurisdiction (28 U.S.C. § 1367) because it arises from the same transactions and from a common nucleus of operative facts as alleged in the first three federal causes of action.

105.   As alleged above, LifeScan has attempted to monopolize and/or monopolized the relevant market for blood glucose test strips compatible with several of LifeScan's One Touch Ultra meters throughout the United States the United States and in the State of Florida, in violation of Section 542.19 of the Florida Statutes.

## COUNT VI
### (Unlawful Unreasonable Restraint of Trade Violation of Florida Antitrust Act of 1980)

106.   Plaintiff, SPG, hereby alleges and incorporates by reference each allegation set forth in Paragraphs 1 through 105 of this Complaint, as if set forth in full herein.

107.   This Court has jurisdiction over this Count VI based on the Doctrine of Supplemental Jurisdiction (28 U.S.C. § 1367) because it arises from the same

transactions and from a common nucleus of operative facts as alleged in the first three federal causes of action.

108.   As alleged above, LifeScan has unreasonably restrained trade in the relevant market for blood glucose test strips compatible with several of LifeScan's OneTouch Ultra meters both throughout the United States and in this State of Florida, in violation of Section 542.18 of the Florida Statutes.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, SPG, prays that this Court adjudges and decrees and follows:

1.      That the conduct alleged in the Count I herein be adjudged to be in violation of Section 3 of the Clayton Act (15 U.S.C. § 14);

2.      That the conduct alleged in the Count II herein be adjudged to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

3.      That the conduct alleged in the Count III herein be adjudged to be unlawful monopolization and/or attempt to monopolize in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

4.      That the conduct alleged in the Count IV herein be adjudged to constitute intentional interference with actual and prospective business relationships;

5.      That the conduct Alleged in Count V herein be adjudged to constitute unlawful attempted monopolization and/or monopolization in violation of Section 542.19 of the Florida Statutes;

6.      That the conduct alleged in Count VI be adjudged to constitute an unlawful unreasonable restraint of trade in violation of Section 542.18 of the Florida Statutes;

7.     That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Plaintiff recover treble the amount of its actual damages sustained by reason of those federal antitrust violations;

8.     That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Plaintiff be awarded a reasonable attorneys' fee and costs of litigation;

9.     That, pursuant to Section 16 of the Clayton Act (15 U.S. C. § 26), the anticompetitive, predatory and/or exclusionary conduct of Defendant, LifeScan, be permanently enjoined;

10.    That Plaintiff, SPG, be awarded punitive or exemplary damages on its tort claim; and

11.    For such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff, SPG, hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED on this 8th day of September, 2017.

*/S/Chris Crawford*
CHRIS CRAWFORD
Law Office of Chris Crawford
1 South A Street, Suite 103
Pensacola, Florida 32502
Telephone: (850) 432-7726
Facsimile: (850) 226-5725
E-mail:  Chris@bettercallchris.net
Attorney for Plaintiff

Maxwell M. Blecher*
Donald R. Pepperman*
BLECHER COLLINS & PEPPERMAN,
P.C.
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656
E-mail: mblecher@blechercollins.com
        dpepperman@blechercollins.com

Attorneys for Plaintiff

                              *Pro Hac Vice
                    Admission to be applied for.

90901.1